## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **MOTHER DOE, on her own behalf, and as parent and natural guardian of JANE DOE, a minor,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**DORCHESTER SCHOOL DISTRICT TWO, and FORT DORCHESTER HIGH SCHOOL,**<br><br>*Defendants.* | Civ. No. <u>2:24-cv-06490-RMG</u><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mother Doe ("Mother Doe"), on her own behalf and as parent and natural guardian of Jane Doe (collectively, "Plaintiffs"), by and through their attorneys, Nesenoff & Miltenberg, LLP, and Ferguson Law and Mediation, LLC, as and for their Complaint against Defendants Dorchester School District Two (the "District" or "DD2"), and Fort Dorchester High School (the "School", "Fort Dorchester" or "FDHS", collectively Defendants), respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.      The Defendants purport to be education providers that help and aid students in their quest for knowledge as they embark upon their life's journey. True its word, Defendants offered Plaintiffs an unmatched experience, the impact of which, in all likelihood will haunt Plaintiffs for the remainder of their lives.

2.      Indeed, after what was sure to be the most frightening experience of Plaintiff Jane Doe's life when another student sexually assaulted her during school, Plaintiffs turned to the Defendants and its various agents and employees for protection. Instead, they were greeted with

1

outright disregard, disinterest, skepticism, and further made to feel victimized by the very institution that vowed to keep them safe.

3.     Plaintiff therefore brings this action against the Defendants, for among other things, violations of Plaintiffs' rights as guaranteed by: (i) Title IX of the Education Amendments of 1994 ("Title IX"), (ii) the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution as guaranteed by 42 U.S.C. § 1983, and (iii) South Carolina State Law, together with any and all claims which can be reasonably inferred from the facts as set forth herein.

## THE PARTIES

4.     Plaintiff Mother Doe is the parent and natural legal guardian of Plaintiff Jane Doe, a minor.[1]

5.     At all relevant times, and continuing through the present date, Plaintiffs Mother Doe and Jane Doe are residents and are domiciled of the State of South Carolina.

6.     At all relevant times to this Complaint, Plaintiff Doe has been an individual under the age of majority.

7.     Upon information and belief, at all relevant times to this Complaint, Dorchester School District Two (the "District" or "DD2") was and is a duly constituted school district within the State of South Carolina and under the jurisdiction of the City of North Charleston which provides public education to the students in various public institutions, including Fort Dorchester High School. DD2's main office is located at 815 South Main Street, Summerville, South Carolina.

8.     Upon information and belief, at all relevant times to this Complaint, Fort Dorchester High School ("FDHS" or "Fort Dorchester" or the "School") was and is a public high

---

[1] Mother Doe and Jane Does are pseudonyms to protect identify of the parties based on the sensitive facts involved in this suit.

school located at 8500 Patriot Boulevard, North Charleston, South Carolina, and within the jurisdiction of the City of North Charleston and the District.

9.      Upon information and belief, the District receives federal funding. Upon information and belief, the District thereafter allocates, at least in part, monies generated through federal funding to Fort Dorchester High School. Accordingly, FDHS and the District are subject to liability under Title IX.

## JURISDICTION AND VENUE

10.     This Court has federal question and supplemental jurisdiction over Plaintiffs' claim(s) based upon 28 U.S.C. §§ 1331 and 1367 because the federal law claim arises under the Constitution and statues of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over the Defendants on the grounds that they are located and conduct business within the State of South Carolina.

12.     Venue for this action is proper in this case pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or occurrences giving rise to Plaintiffs' claims occurred within this judicial district.

13.     December 11, 2023, Plaintiff served upon the appropriate parties a notice of claim letter to fulfill the state's requirement.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.      The Defendants' Applicable Policies, Procedures, and Trainings**

14.     Upon information and belief, at all times relevant to this Complaint, FDHS maintained and enforced the District's Parent/Student Handbook (the "Handbook")[2]. The District also published their trainings and applicable policies on their website. *See Title IX Training*, DORCHESTER SCHOOL DISTRICT TWO, (last visited Nov. 13, 2024), https://www.ddtwo.org/district/departments/federal-programs/title-ix-training.

15.     The Handbook notes that "Dorchester School District Two shall not discrimination the basis of sex, race, color, national origin, religion or handicap in the education programs or activities which it operates." (Handbook, 80). The Handbook further notes that the District has "grievance procedures" in place to address complaints, including complaints that fall within the scope of Title IX, accordingly.

16.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq*. provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

17.     Title IX applies to all public and private educational institutions that receive federal funding, including FDHS, a school within the District.

18.     The Handbook explicitly prohibits sexual assault: "any sexual act directed against another person, forcibly and/or against that person's will; or not forcibly or against the person's will where the victim is incapable of giving consent. This is prohibited and will be referred to law enforcement." (Handbook, 57).

---

[2] In light of the time lapse between the events and the date of this filing, the only publicly available copies of the Handbook are from the 2023-2024 school year. The following citation and references are based on the publicly available version. Upon information and belief, the handbook from the prior academic year is substantially similar to the Handbook cited herein.

19.    "Harassment, intimidation, hazing,…[and] bullying" is prohibited by the Handbook. (Handbook, 57).

20.    "Harassment, intimidation, hazing, or bullying" are defined in the Handbook at "a gesture, electronic communication, or a written, verbal, physical or sexual act reasonably perceived to have the effect of either of the following: [(i)] harming at student physically or emotionally damaging a student's property, or placing a student in reasonable fear of personal harm or property damage[; or (ii)] insulting or demeaning a student or group of students causing substantial disruption in, or substantial interference with, the orderly operation of the school." (Handbook, 57).

21.    The District promises in the Handbook to investigate complaints "promptly, thoroughly and confidentially." (Handbook, 57).

22.    Importantly, "[a]ll school employees are required to report alleged violations of this policy to the principal or his/her designee." (Handbook, 57).

23.    Retaliation for reporting a complaint is strictly prohibited by the Handbook. "The [D]istrict prohibits retaliation or reprisal in any form against a student or employee who has filed a complaint or report of harassment, intimidation, hazing, or bullying. The district also prohibits any person from falsely accusing another as a means of harassment, intimidation or bullying." (Handbook, 57).

24.    "Students and employees have a responsibility to know and respect the policies, rules and regulations of the school and district. Any student or employee who is found to have engaged in the prohibited actions as outlined in this policy will be subject to disciplinary action, up to and including expulsion in the case of a student or termination in the case of an employee." (Handbook, 57).

25.    The Handbook describes that "consequences and appropriate remedial actions" will be taken for individuals in violation, but that they "will be varied" based upon the issue itself, the student's prior history, and other factors. (Handbook, 58).

26.    The Handbook encourages "[a]n aggrieved student" to confront the person who engaged in the harassing behavior to stop.

27.    The Handbook details a process of how to commence a formal investigation, including with investigative interviews of the complaining party and responding party, witness interviews, collection of evidence, preparation of a report, and a finding.

28.    The District's trainings on Title IX, inclusive of sexual harassment and assault, are published online. *Title IX Training*, DORCHESTER SCHOOL DISTRICT TWO, (last visited Nov. 13, 2024),

https://resources.finalsite.net/images/v1693258229/ddtwoorg/evml2v4nfpdl40h4ezou/Title_IX_ Training.pdf.

29.    The trainings provide a detailed recounting of mandated reporting and the investigation and adjudication process.

## II.    Jane Doe and Mother Doe's Experience at FDHS

### A.    *Background Information*

30.    Jane Doe spent a large portion of her adolescent years enrolled as a student in the District. Prior to the events that began on November 14, 2022, Jane Doe had a perfect attendance record, a spotless disciplinary record, and achieved high academic marks.

31.    Excited to embark on her high school years at Fort Dorchester, Jane Doe immersed herself in the activities of the School, including as a member of the track team, and Beta Club. Jane Doe also participated in volunteer opportunities regularly with the School. Jane Doe thrived

at the School by enjoying friendships as she had at the other schools of the District and achieving Honor Roll Scholar Athlete status; however, for reasons far beyond her control, Jane Doe's high school experience would change dramatically.

32.     Mother Doe was employed as a teacher in the District at FHDS for several years. During her time there, she enjoyed a fruitful and successful career as an education and was well liked and respected by students and colleagues.

**B.     *Jane Doe is Assaulted by an Older Male FDHS Student***

33.     Due to Jane Doe's participation on the track team, she missed part of an in-class test; therefore, on November 14, 2022, Jane Doe scheduled and commenced a make-up test.

34.     Jane Doe's teacher, Ms. Richardson, placed her in the hallway outside of the classroom to commence the make-up test. Ms. Richardson also sent John Smith[3], a male 16-year-old student, into the hallway along with Jane Doe to commence a make-up test, as well.

35.     Ms. Richardson, before moving back into the classroom, instructed Jane Doe to "share her notes" with John Smith. Jane Doe was absolutely shocked by this, as it is ingrained in her to complete her own work and as a result, she did not do so.

36.     Jane Doe began to take her test in the hallway alongside John Smith. As Jane Doe took the test, John Smith touched Jane Doe's leg repeatedly. Although Jane Doe told him to stop and tried to move away, he did not relent. Instead, John Smith persistently groped Jane Doe as she took the test.

37.     John Smith then sexually assaulted Jane Roe: he placed his hands on Jane Doe's vaginal area, outside of her pants, and squeezed. Jane Roe was only 14 years old at the time.

---

[3] John Smith is a pseudonym used as he is a minor child.

38.     Jane Doe went into the classroom to finish her text; however, Ms. Richardson sent her back into the hallway to finish the test. Left with no choice, Jane Doe went back into the hallway, with her assaulter, to finish her test.

39.     John Smith then reached his hand under Jane Doe's shirt and grabbed her breast. Jane Doe stood up to get away from him and told him repeatedly (again) to stop, but John Smith—two years her senior—easily dominated Jane Doe's small stature.

40.     John Smith pushed Jane Doe's head against the wall, physically harming her, and verbally threatened her by asking if she "wanted a concussion." John Smith continued threatening Jane Doe by stating that he would slap her, that she was his "little secret", and that he knew where she lived.

### C.     *FDHS Teachers and Administrators Quickly and Summarily Dismiss Jane Doe's Complaint of Sexual Assault*

41.     This brutal assault in her own School left Jane Doe devastated and traumatized. Jane Doe communicated with a friend via text message about what occurred on the same day.

42.     The next day—November 15, 2022—Mother Doe learned of the assault.

43.     Mother Doe, a teacher employee at Fort Dorchester at the time, spoke with her colleague Ms. Richardson, Jane Doe's teacher, about the sexual assault, on November 15, 2022.

44.     Upon learning of the brutal assault, Ms. Richardson stated "oh no, [John Smith] has often flirted with Jane Doe and has been told numerous times to stop."

45.     Mother Doe then immediately went to report this to District Security Officer, Officer Bishop, and asked to see the security footage from the sexual assault.

46.     Officer Bishop showed Mother Doe the video security footage. As they watched the assault unfold before their eyes, Officer Bishop stated to Mother Doe that her daughter should have stood up sooner.

47.     Mother Doe requested a copy of the footage; however, Officer Bishop declined to provide it to her and said the District would not allow it, but that she could pose her request to an Assistant Principal Megan Profit ("Ms. Profit").

48.     Assistant Principal Yarborough ("Mr. Yarborough") later on November 15, 2022, visited Mother Doe in her classroom to discuss the sexual assault.

49.     Mr. Yarborough stated to Mother Doe that he spoke with both Jane Doe and John Smith, and that this was an issue of "he said, she said."

50.     Incredibly, Mr. Yarborough further said that "[John Smith] asked for Jane Doe's consent several times and was given it."

51.     The response to Jane Doe's assault absolutely devastated Mother Doe, as it was clear to her that Mr. Yarborough swiftly dismissed her daughter's horrible sexual assault.

52.     Mother Doe asked if he even watched the video footage, to which Mr. Yarborough replied, "a little."

53.     Not once did any single teacher or administrator reference Title IX or the Handbook's policies and procedures.

54.     On November 16, 2022, Mother Doe requested a copy of the video from Ms. Profit via email. Ms. Profit replied that Mother Doe would be required to file a Freedom of Information Act ("FOIA") request within the District or acquire a subpoena to obtain the video footage.

55.    That same day, Jane Doe was scheduled to take a test; however, due to the sexual assault she experienced a mere two days prior, she was incredibly upset. John Smith's presence in the School only further exacerbated the situation.

56.    Jane Doe went to Mother Doe's classroom for comfort and was not in a place emotionally to take the test due to the intense stress caused by the sexual assault.

57.    Upon information and belief, other students who have parents that are employed at the District commonly visit the classrooms of their parents, even when scheduled to be in their own class. Upon information and belief, the District has not confronted any other teachers about their own children visiting their classrooms.

58.    Mother Doe immediately sent an email to Jane Doe's teacher, Ms. Maas, to request permission for Jane Doe to remain in her mother's classroom and take the test the following day. Ms. Maas responded in agreement, permitting Jane Doe to remain with Mother Doe and take the test later.

59.    Later that evening, Ms. Maas asked Mother Doe via email why she did not sign Jane Doe out on the day of the test. This confused Mother Doe because she understood that Ms. Maas had approved her request for Jane Doe to remain with her for the remainder of the day and to take the test the next day. Mother Doe responded that she did not say she was "singing out" Jane Doe on that day. As Mother Doe did not want to write about the assault in an email, she advised Ms. Maas that she could speak with her about the situation. Ms. Maas responded that this was acceptable and hoped that Jane Doe was okay.

**D.**    ***FDHS Administration Fails to Inquire on the Status of Jane Doe or Provide an Information on a Complaint in Light of the Assault and Instead, Confronts Mother Doe Regarding the Missed Test***

60.    On November 17, 2022, Jane Doe returned to FDHS. Before the school day even commenced, Jane Doe completed her test for Ms. Mass, less than 24 hours from the original test date.

61.    From kindergarten until this point, Jane Doe had not missed a single day of school. The trauma from the sexual assault caused her to miss school days for the first time. Although she continued to attend school, it was extremely difficult for her.

62.    During second period on November 17, 2022, Principal Tripp Aldredge ("Mr. Aldredge" or "Principal Aldredge") and Ms. Profit unexpectedly entered Mother Doe's classroom, slammed the door, and sat down. At the time, second period served as Mother Doe's planning period.

63.    Mother Doe assumed they visited her classroom to discuss the sexual assault her daughter suffered; however, they told Mother Doe that Ms. Maas reported that Mother Doe asked if Jane Doe could take her test the following day.

64.    Taking tests at other times was common at FDHS, as students often take tests one day or several days after a scheduled test date. Upon information and belief, Ms. Maas has permitted this to occur before the request concerning Jane Doe. In light of the circumstances of Jane Doe's traumatic sexual assault, and her emotional response just before the scheduled test, the request to take a test less than 24 hours after its initially scheduled time is not unreasonable.

65.    Principal Aldredge stated that Ms. Maas was "on her heels" about this.

66.    This shocked and confused Mother Doe, as she had understood and shared that Ms. Maas agreed to let Jane Doe spend the remainder of the day with her due to Jane's emotional response and permitted her to take the test the day after its initial scheduling.

67.    Principal Aldredge accused Mother Doe of being "unprofessional" and exhibiting "favoritism" towards her daughter, even though both Principal Aldredge and Ms. Profit were fully aware of the assault that Jane Doe suffered only days before that directly contributed to her emotional response the day before.

68.    Mother Doe shared that Principal Aldredge and Ms. Profit made her feel uncomfortable during that direct and unwarranted confrontation, especially in light of the fact that Ms. Profit typed "official" notes during this encounter.

69.    Principal Aldredge and Ms. Profit questioned Mother Doe on why she did not leave and take Jane Doe home on the day of the test. Mother Doe responded that she did not want to burden the school with obtaining a substitute because she knew numerous teachers already were absent on that day.

70.    Although Ms. Profit remained silent, she continued to take notes.

71.    Principal Aldredge, during this meeting, continued to speak in such a manner that he bullied, intimidated, harassed, and insulted Mother Doe.

72.    While Mother Doe continued to answer the questions and speak with them, she eventually shared that she had to leave to attend a previously scheduled field trip.

73.    Principal Aldredge told Mother Doe to separate her role as a teacher from her role as a parent.

74.    Before the surprise confrontation concluded, Mother Doe shared that she was taken aback at the fact that they made it a point to immediately confront and address the purported concerns of Ms. Maas, but did not ask a single question about Jane Doe or how she was doing after the sexual assault.

75.     Mother Doe also advised that she welcomed them to speak with her about Jane Doe's test at a later time due to her departure for the field trip.

76.     The entire interaction left Mother Doe feeling harassed and intimidated.

77.     Jane Doe later told Mother Doe that while she took the test in Ms. Maas's room on the morning of November 17, 2022, Principal Aldredge entered the room and stated to Ms. Mass that they needed to speak about Mother Doe. Principal Aldredge had a clear line of vision to Jane Doe, who was in the classroom of Ms. Maas making up the test from the day before at that time.

78.      Jane Doe further shared with Mother Doe that Ms. Maas suggested they enter the hallway to speak and promptly left the room where Jane completed her test.

### E.    Jane Doe's Sexual Assault is Reported to Local Police

79.     As the days went on, FDHS and its administrators took no further action concerning Jane Doe's assault.

80.     After received no assistance On November 19, 2022, Mother Doe reported the sexual assault to the North Charleston Police Department ("NCPD").

81.     Mother Doe spoke with NCPD in person to report the crime perpetrated against Jane Doe.

82.     NCPD referred her to the Special Victims Unit, where she shared the account of the assault with Detective Tiffani Crider ("Detective Crider" or "Det. Crider").

83.     NCPD created an incident report of the sexual assault that clearly noted that the incident occurred at FDHS.

84.     Jane Doe participated in a forensic interview with a specialist, which Detective Crider attended.

**F.** **As NCPD Conducts an Investigation into Jane Doe's Assault, Ms. Profit Confusingly Forbids Mother Doe from Interacting with Jane Doe's Teacher**

85.    Over the course of the next few weeks, Mother Doe provided Detective Crider with information and exchanged messages concerning the case.

86.    Jane Doe also attended therapy to help her in light of the traumatic assault she experienced.

87.    John Smith continued to freely roam the School, upon information and belief, without restriction. Although Jane Doe and Mother Doe did their best to avoid him in the hallways, seeing him was unavoidable.

88.    During the same time period that NCPD looked into the case, on or around January 6, 2023, Ms. Profit ultimately forbade Mother Doe from communicating with Ms. Mass, instructing that any academic concerns should be brought to Ms. Profit instead.

89.    Ms. Profit's purported logic for this bar on communication concerning her own daughter's education was that "it could create issues" if Mother Doe had any concerns about the class since they work together.

90.    In essence, Ms. Profit barred Mother Doe from advocating for her daughter in the academic setting.

91.    Mother Doe received a curt voice mail message on the evening of Sunday, January 15, 2023, regarding Ms. Maas giving Jane Doe a deadline to make up a test that Jane had missed due to being absent for a viral infection.

92.    Ms. Profit's behavior perplexed Mother Doe behavior here in light of the November 17, 2022, conversation where Principal Aldredge stated to Mother Doe, with Ms. Profit present taking notes, that she needed to separate the role of parent from teacher.

14

93.     Mother Doe found it unlikely that Ms. Profit would have called and left an aggressive voice mail message to a parent who was not a teacher at the school about a minor concern on a Sunday evening.

**G.     *FDHS Attempts to Impede the Investigation of NCPD, Highlighting Their Failure to Comply with Mandatory Reporting Requirements***

94.     Detective Crider wrote in the incident report that on February 16, 2023, she went to FDHS intending to speak with the suspect—John Smith—and asked to speak to a series of individuals there, ultimately asking to speak with administration.

95.     None other than Ms. Profit emerged to meet with Detective Crider. As they walked to her office, Ms. Profit asked what student he wanted to see and said she was "familiar with the case" upon Detective Crider's response with John Smith's identity.

96.     Detective Crider further wrote that Ms. Profit left the room and returned after approximately five to ten minutes stating that she brought the suspect to outside of her office, but that she needed to advise him of some things she felt Detective Crider was not aware of.

97.     Through this act, Ms. Profit attempted to impede the investigation of Det. Crider.

98.     At that juncture, Detective Crider recognized that the school failed to meet their mandatory reporting requirements, as Ms. Profit had admitted to knowing of the sexual assault and did not fulfill these requirements. Detective Crider then moved to leave, but before departing, shared that they failed to report this assault.

99.    Detective Crider wrote in the Incident Report that after leaving FDHS, she contacted the Dorchester County Solicitor's Office concerning the interaction and the utter failure of administrators at FDHS to report the assault.

100.    Per Det. Crider's Incident Report, on February 23, 2023, Det. Crider, Maor of Investigation Al Kuechler ("Maj. Kuechler"), and then-Deputy Chief Ken Hagge[4] ("DC Hagge") met with several administrators from the District, including Principal Aldredge and Ms. Profit to "discuss the mandatory reporting law."

101.    In her Incident Report, Det. Crider quoted the 2022-2023 Handbook which noted that "[a]ny sexual act directed against another person, forcibly and/or against that person's will; or not forcibly or against the person's will where the victim is incapable of giving consent" and is required to be reported to law enforcement. (Handbook, 57). Det. Crider further noted that "[t]he board prohibits acts of harassment, intimidation, hazing, or bullying of a student by students, staff and third parties that repeatedly interfere with or disrupt a student's ability to learn and the school's responsibility to educate its students in a safe and orderly environment…"

### H.    Mother Doe is Retaliated Against by District Administrators

102.    At the same time, Mother Doe faced harassment, intimidation, and retaliation from FDHS, creating a hostile environment.

103.    On February 16, 2023, Assistant Principal Tawanna Jamison ("Ms. Jamison") pulled Mother Doe out of her classroom to meet with her and Principal Aldredge.

104.    Mother Doe clearly stated she felt intimidated and harassed, and that she did not feel comfortable being removed from her classroom in such a manner without any notice and without a plan for her absence.

---

[4] DC Hagge, upon information and belief, retired on or around August 16, 2023.

105.    Mother Doe directly asked Ms. Jamison what the meeting concerned, to which Ms. Jamison replied that she did not know; however, Ms. Jamison's actions later belied her statement, as it became clear she understood the content of the meeting.

106.    Ms. Jamison then called Principal Aldredge, stated that Mother Doe refused to meet with him, and aggressively pushed the phone in Mother Doe's face with the instruction that she was required to speak with Principal Aldredge.

107.    Principal Aldredge stated that they would be required to meet, but again would not share the reason. Mother Doe again expressed her consternation with the situation. Left with no choice and no knowledge as to why she needed to attend this meeting, she went to meet with Principal Aldredge.

108.    Mother Doe felt intimidated immediately upon entry into Principal Aldredge's office.

109.    Mother Doe observed Ms. Jamison typing and inquired as to whether these would serve as official meeting notes. Ms. Jamison confirmed that they would serve as official meeting notes but denied Mother Doe a copy after her respectful request for one.

110.    Ms. Jamison spoke to Mother Doe in an aggressive and loud manner, prompting Mother Doe to verbally express her concerns about Ms. Jamison's demeanor to Principal Aldredge.

111.    Ms. Jamison responded angrily "you better get one thing straight, this is my resting bitch face."

112.    Principal Aldredge asked Ms. Jamison to remain calm and to stop being aggressive. Ms. Jamison continued to type for the entirety of the meeting, with the exception of when she acted or shared something aggressively.

113.    Mother Doe eventually learned that the meeting concerned her early departure from school on Monday, February 13, 2022, and then why she did not attend school on February 14, 2022.

114.    Principal Aldredge also inquired Mother Doe about not monitoring during official ACCESS testing, an unrelated matter that Mother Doe understood to be resolved after correspondence with the South Carolina Department of Education.

115.    Under the guise of questioning, Principal Aldredge repeatedly stated that Mother Doe's behavior on February 13 and 14, 2022 was "suspect."

116.    Mother Doe asked what he meant by suspect, to which Principal Aldredge declined to expound upon, and instead kept repeating that it was "suspect."

117.    Mother Doe explained that on February 13, 2022, she had intended to return to her classroom for fourth period but became sick and had to leave school.

118.    While on her way back to her classroom, she saw three students in the hallway, who she told she was sick and had to leave.

119.    Mother Doe also shared that she instructed two of these students to proceed to the library to access TEAMS to complete their assignments. For the third student, Mother Doe asked them to place a note on her door stating that she had to leave school due to her illness and then to proceed to the library with the others.

120.    Mother Doe shared that she called Ms. Jamison to inform her, but could not reach her.

121.    Upon information and belief, other teachers routinely arrive or depart early. Upon further information and belief, these teachers are not reprimanded or spoken with about these late arrivals or early departures.

122.   Mother Doe further explained that she put in for an absence for February 14, 2023, for sick leave several days in advance, due to two doctor's appointments.

123.   Mother Doe shared that she did not understand why Principal Aldredge questioned her about a sick day that she had a right to take and had requested in advance.

124.   Of note, Mother Doe rarely took a sick or vacation day.

125.   Upon information and belief, it is routine for teachers to request and take days off in the manner that Mother Doe did.

126.   Upon information and belief, one of Jane Doe's teachers took off almost every Monday for ten weeks of school in a row and several Fridays. Jane Doe recalled that this teacher told the class she did so because she "had the days."

127.   Upon further information and belief, this teacher had not received any reprimand for taking time off.

128.   Principal Aldredge then stated that although Mother Doe did put in her sick leave in the official AESOP sub system, she did not fill out the redundant form in TEAMS for the front office staff on the same date that she entered her leave into AESOP.

129.   Mother Doe apologized and stated that she did fill it out but just not on the same day that she entered her leave into the AESOP system.

130.   Upon information and belief, and inquiry to the staff member who oversees the completion of these forms, teachers often hand return this redundant form not on the same date and are often reminded to complete it at a later time. Upon further information and belief, other teachers did not receive reprimands for this.

131.    Principal Aldredge continued to interrogate Mother Doe on the test monitoring and why she was on her computer during ACCESS testing—a separate and resolved matter—and leaving early for over one hour.

132.    Principal Aldredge asked Mother Doe the same questions repeatedly. By way of example and not limitation, Principal Aldredge asked what time she left on February 13, 2022, to which Mother Doe responded that she left at approximately 2:30 pm but could not be sure of the exact time, which did not satisfy Principal Aldredge. Mother Doe remained consistent and truthful in all of her responses.

133.    Eventually, she shared that she had to leave to get her daughter and exited the interrogation disguised as a meeting.

134.    On February 22, 2023, Mother Doe saw John Smith in the hallway. She attempted to look away but saw that he gave her an intimidating look up and down, which disturbed her immensely.

135.    On February 23, 2023, as Mother Doe prepared to depart FDHS, Principal Aldredge and Ms. Profit entered her classroom, slammed the door, and sat down, completely unannounced.

136.    Mother Doe raised her objection to the meeting several times because she understood she wanted to have someone else present with her and also understood the purpose; however, Principal Aldredge and Ms. Profit denied her this opportunity.

137.    Ms. Profit once again typed up notes during this meeting, and once again, Ms. Profit denied Mother Doe's request for a copy of the notes.

138.    Principal Aldredge again relentlessly grilled Mother Doe about leaving school early on February 23, 2023. Mother Doe again stated exactly as she did before, that she departed around

approximately 2:30 pm but could not be certain of the time because she was quite ill. Mother Doe also noted that she was not in her assigned classroom that day due to it being utilized for testing.

139.    Principal Aldredge also stated that the school examined her computer and files to "prove" she was on her school issued computer during ACCESS test administration. Again, Mother Doe understood this matter to be resolved.

140.    On February 24, 2023, John Smith again encountered Mother Doe in the hallway. Once again, she did her best to look away, but was deeply traumatized by the assault of her daughter.

I.    ***Fort Dorchester's Retaliation Against Mother Doe Escalades in the Form of a Formal Reprimand***

141.    On March 13, 2023, Ms. Profit summoned Mother Doe to speak with her and Principal Aldredge. Upon arrival, Ms. Profit shared that Principal Aldredge wanted to speak with Mother Doe once again, about these same alleged concerns of leaving early and use of electronics during ACCESS testing.

142.    Mother Doe responded that they had met three times about this and said she wanted to have someone accompany her in this meeting, to which Ms. Profit responded that was not an option. Mother Doe even followed up with an email stating that she would meet with Principal Aldredge if she could bring someone with her.

143.    On March 14, 2023, Principal Aldredge sent Mother Doe an email stating that he would meet with her during her third period, but would not provide notes from the prior meetings. Mother Doe said she would meet with him again if she could bring someone with her. He responded inviting her to meet on March 15, 2023, to which she again asked to bring someone with her.

144.    Mother Doe received a formal reprimand letter via email on March 16, 2023 (the "March 16 Reprimand") from Principal Aldredge. A PDF of the letter was attached to the email, and curiously, the letter itself was dated March 9, 2023, even though Principal Aldredge did not send it to Mother Doe via email until March 16, 2023.

145.    Further highlighting its erroneous backdate, the March 16 Reprimand noted her "refusal" to speak with him; however, it did not include that they had previously met several times concerning these issues and that Mother Doe did offer to meet with him with someone else present due to concerns about his behavior exhibited in the prior meetings.

146.    The March 16 Reprimand stated that he learned that Mother Doe was involved in an alleged testing violation on Friday, February 10, 2023. This alleged violation consisted of using her phone to briefly and quickly "check something" for her daughter and that "[u]sing your phone during testing constitutes failing to proctor the test to ensure examinees are engaged in appropriate test-taking activities."

147.    The March 16 Reprimand then went on to detail other alleged concerns, in a clearly targeted attack by the District against Mother Doe.

148.    The March 16 Reprimand went into detail about the alleged use of a school computer during ACCESS testing—again, an issue that Mother Doe had understood was resolved.

149.    The March 16 Reprimand stated that Mother Doe's account was not consistent with alleged video footage, despite Mother Doe's consistent and truthful account shared at the two interrogations disguised as meetings. It remains unclear what footage, if any, FDHS examined, as Mother Doe was not in her assigned classroom due to testing that day.

150.    The March 16 Reprimand further noted the meeting with Mother Doe on November 17, 2022, but suspiciously did not note the other interrogations disguised as meeting that occurred. It also noted the January 6, 2023 ban on communication with Ms. Maas, imposed by Ms. Profit.

151.    Finally, the March 16 Reprimand notes that despite the "tremendous investment" in Mother Doe's career, "further incidents of untruthfulness and/or misuse of your employment status may result in further disciplinary action, to include termination."

152.    The March 16 Reprimand did not note the assault of her daughter, Jane Doe, or any concerns raised as a result of that, or any consistent and ruthful explanations provided by Mother Doe to rebut the allegations in the letter.

153.    In all of her years working in the District, Mother Doe never once had a reprimand placed in her file until this moment.

### J.    John Smith—Jane Doe's Assailant—Is Arrested and Formally Charged

154.    Also on March 16, 2022, Det. Crider advised Mother Doe that John Doe had been arrested and charged with "Assault and Battery 2nd".

155.    Det. Crider advised that there would be further contact with Mother Doe and Jane Doe concerning the matter.

### K.    FDHS Retaliates Against Jane Doe with False Allegations

156.    In the months after her brutal assault, Jane Doe suffered, but did her best to continue to make improvement in therapy, and keep up her schoolwork.

157.    Jane Doe was further retaliated against when FDHS suspended her and placed her for evaluation for expulsion on March 17, 2023.

158.    FDHS alleged that that Jane Doe directly threatened a teacher at school during school hours.

159.    No such incident occurred. Instead, Jane Doe and a friend sent a private voice mail venting to a friend on the track team while seated in a car in the parking lot of Harris Tetter, a grocery store. This occurred at approximately 7:00 pm, well after school hours and far from school premises. The voicemail was left for a friend where Jane Doe simply vented about the teacher, and did not threaten anyone. Both students are heard on the recording, but Jane Doe firmly maintained that she did not make any threatening remarks whatsoever. Notably, the voice mail did not directly go to the teacher, but instead, did circulate to a group text message with the track team.

160.    Despite Mother Doe and the parent of Jane Doe's friend sharing this information, most importantly, that they did not threaten anyone, FDHS pressed ahead.

161.    Vice Principal Brent Hamric ("VP Hamric" or "Mr. Hamrick") questioned Jane Doe about this alleged incident. Although Jane Doe asked for her mother to be present, he refused Jane's request, and instructed her to write her statement when she was done crying.

162.    In her statement, Jane Doe wrote that they did not intimidate anyone, were in Harris Teeter parking lot and not on school grounds, and it occurred well into the evening, after school hours.

163.    While in the room, Jane Doe was upset at this, as she had never faced such issues, being a model student until this point. She asked to go to the restroom, but VP Hamric assigned someone to escort her because she was an alleged risk, despite her impeccable record.

164.    As Jane Doe experienced devastation at being accused of a crime she did not commit, and in the wake of her sexual assault, Mother Doe's doctor recommended she take a medical leave for two weeks. Mother Doe signed the paperwork to put this into effect.

165.    Jane Doe participated fully in the process concerning the suspension and expulsion, to clear her name.

166.    The School did not commence the hearing (the "Hearing") until 18 days after Jane Doe was placed up for expulsion—April 3, 2023—despite the District's policy that this should be commenced in 15 days.

167.    Mother Doe requested for the School to correct inaccurate details in the documentation; however, the School denied this request, proceeding with their biased against Jane Doe.

168.    Notably, at the Hearing, FDHS administrators could not discern the two students' voices in the voice mail recording. Jane Doe remained firm that she did not make any intimidating remarks whatsoever and her voice is mere venting about a particular teacher.

169.    While Jane Doe did her best to maintain her standard of academic excellence, her grades did suffer during her period of suspension due to the lack of access to her teachers.

170.    On April 5, 2023, Mother Doe received communication that FDHS wrongly found the allegations substantiated, Jane Doe could continue her course of study at FDHS for the 2022-2023 school year, and Jane Doe could resume athletics in the Fall of 2023.

**L.    The Retaliation Against Mother Doe Continues Due to the District Placing her on Administrative Leave**

171.    On April 6, 2023, Mother Doe returned to FDHS at approximately 8:00 am and taught her first period course.

172.    During Mother Doe's second period—her planning period, District Director of Personnel Camilla Pinckney ("Ms. Pinckney"), entered Mother Doe's classroom, closed the door, and handed her a letter back dated March 27, 2023 ("Leave Letter").

173.    The Leave Letter placed Mother Doe on administrative leave for alleged falsification of a single time sheet. Ms. Pinckney verbally told Mother Doe she would be placed on leave and that they would be investigating this.

174.    Mother Doe was utterly confused by the wrongful allegation, as she is always honest and forthright.

175.    Mother Doe asked to see the timesheet and for further details so she could defend herself against this wrongful allegation, and clear up what she would think to be a clerical error, but Ms. Pinckney refused to provide the time sheet and repeated that they were "investigating."

176.    Ms. Pinckney did confirm that the allegations stemmed from a single time sheet.

177.    Ms. Pinckney instructed Mother Doe that she needed to leave campus immediately, that Mother Doe would not be allowed on campus until the investigation concluded, and that when Mother Doe picked up her daughter from School, she could not exit her car.

178.    Mother Doe also asked if she could prepare anything for her students in her absence, as they remained her number one concern. Ms. Pinckney responded firmly, no.

179.    Mother Doe was absolutely shocked at what could be described as a clerical error that led to her being placed on administrative leave and banned from campus.

180.    In June of 2023, Mother Doe learned of a colleague who, upon information and belief, also received notification concerning time sheet errors. Instead of being placed on leave, this colleague exchanged emails with finance to correct the clerical error and was never officially reprimanded or accused of falsification.

181.    On April 17, 2023, after Spring Break, Mother Doe received correspondence from a school staff member responsible for coordinating substitute teachers. This staff member did not have any knowledge of Mother Doe being placed on leave or the students not having any

assignments to complete. Mother Doe emailed Ms. Pinckney once again to see if she needed to provide anything for the students, to which Ms. Pinckney responded that all was taken care of.

### M. Mother Doe and Jane Doe are Formally Diagnosed as a Result of Their Suffering at the Hands of FDHS and the District

182.    While on administrative leave, Mother Doe regularly visited her doctor and on April 20, 2023, her doctors placed her on a leave per the Family and Medical Leave Act ("FMLA") due to severe anxiety, later determined to be complex post-traumatic stress disorder, stemming from the events surrounding her daughter's assault and the retaliation she experienced from School administrators.

183.    Jane Doe received diagnoses of trauma and anxiety from the assault.

### N. Ms. Profit Places John Smith in the Same Room as Jane Doe for AP Testing, Despite His Rightful Placement in a Different Room

184.    On May 4, 2023, Jane Doe took an Advanced Placement ("AP") Final Exam at Trident Technical College. Jane Doe was anxious about this because John Smith also took this course. Mother Doe attempted to assure Jane that she would be in a different room because of their last names; however, this was not the case.

185.    John Smith arrived 45 minutes late to the testing session, and despite knowing what transpired between Jane Doe and John Smith, Ms. Profit placed John Smith in the same room as Jane Doe, instead of placing him where he belonged per his last name.

186.    Upon his arrival in the room, Jane felt sick, and was stricken with anxiety. As a result, she could not finish the test well.

### O. False Rumors Circulate Regarding Mother Doe's Status

187.    While on leave, Mother Doe learned that the long-term substitute teacher told numerous students that Ms. Jamison told her that Mother Doe was allegedly fired for helping students cheat on an ACT test. This shocked Mother Doe, as she never once helped a student cheat at any time, never once even proctored an ACT test, and had not been fired.

188.    In May of 2023, numerous students that Mother Doe had took it upon themselves to find out her home address and visit because they were so concerned about her.

189.    Two separate groups of students visited her on two different days.

190.    They brought her gifts, including candy, balloons, and cards. Mother Doe was tremendously touched by the outpouring of care, as she felt her years of teaching really had an impact.

### III.    Mother Doe and Jane Doe Are Left in Shambles

191.    As a result of the assault on Jane Doe, and the retaliatory actions of the District free flowing therefrom, Jane Doe and Mother Doe have suffered tremendous emotional trauma and have found their lives forever altered.

192.    Jane Doe has since moved to a new school in the District to continue her education away from her assailant.

193.    Her trust in the administration of FDHS, and now all school administrators, is now lost because of the way they utterly failed to take any action whatsoever about her sexual assault and instead retaliated against her and her mother.

194.    Jane Doe's trauma has only been exacerbated by the District's complete mistreatment of her sexual assault and the subsequent retaliation.

195.    Mother Doe left the District and is employed elsewhere as a teacher. Much like Jane, she too has no trust whatsoever in the District after the harassing and retaliatory treatment she received.

196.    Plaintiffs have undergone significant mental health treatment, which continues through the present.

197.    Plaintiff Jane Doe is left with a mark of suspension on her record for an allegation she is innocent of, and Mother Doe is left with an inaccurate disciplinary record, all stemming from the harassment and retaliation they suffered.

198.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered significant emotional injuries. Plaintiffs have been traumatized, deprived of happiness and a feeling of security, and suffer daily from feelings of hopelessness and the inability to move on in their lives.

## COUNT I

### TITLE IX
*Deliberate Indifference*
*(Plaintiff Jane Doe)*

199.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

200.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute is enforceable through an implied private right of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

201.    Title IX prohibits federally funded institutions from engaging in discrimination on the basis of sex.

202.    Sexual harassment is included within the meaning of "discrimination" under Title IX.

203.    A single incident is sufficiently severe to create a hostile environment.

204.    Title IX requires prompt investigation of complaints of sexual harassment and assault and to take interim measures to ensure that its students are not subjected to a hostile environment. The failure to do so amounts to "deliberate indifference" for which Defendants may be held liable for under Title IX.

205.    To establish a claim for deliberate indifference, a Plaintiff must show: "(1) they were a student at an education institution receiving funds; (2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school; (3) the school, through an official who has authority to address the alleged harassment and to instate corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment." *Doe v. Dorchester Sch. Dist. Two*, No. 2:22-CV-03648-RMG, 2023 WL 2352159, at *5 (D.S.C. Mar. 2, 2023); *see also Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021).

206.    The Defendants were deliberately indifferent to the sexual assault that Jane Doe suffered and the harassment that she faced thereafter.

207.    Jane Doe was a student at FDHS, a school in the District. Fort Dorchester and the District receive federal funding.

208.    Jane Doe suffered sexual harassment "so severe, pervasive and objectively offensive" that it deprived her of equal access to educational benefits offered by the Defendants.

209.    Defendants FDHS and the District knew of the sexual assault that Jane Doe suffered very quickly after its occurrence, as noted above.

210.    Defendants FDHS and the District also knew of the harassment Jane Doe faced and her suffering after the assault occurred.

211.    Defendants deliberate chose not to investigate Plaintiff Jane Doe's assault pursuant to Title IX and the procedures required and outlined by the District to ensure compliance with this federal requirement.

212.    Instead, FDHS Assistant Principal allegedly "met with" Jane Doe and John Smith and determined that it was not a violation. This is well outside of the outlined procedures for Title IX investigations.

213.    Multiple school administrators and officials had knowledge the sexual assault and failed to initiate an investigation and implement corrective measures. A non-exhaustive list of the District employees and administrators that knew of the assault appears a follows: Principal Aldredge, then-Assistant Principal Ms. Profit, Mrs. Richadson (a teacher), Ms. Maas (a teacher), and Assistant Principal Ms. Jamison.

214.    In response to the report of Jane Doe's assault, Defendants intentionally and willfully failed to perform any formal investigation at all, conduct any substantive interviews, collective evidence, prepare a report, or provide any supportive measures for Jane Doe.

215.    Further, Defendants intentionally ignored and tacitly condoned further harassment and retaliation perpetrated against Doe and other members of the Defendants' community.

216.     Jane Doe could not so much as travel to classes in the halls or take an exam without fear of having John Smith—her assailant—nearby. Jane Doe moved schools to enjoy full educational benefits in an environment free from her assailant.

217.     Defendants' actions, or lack thereof, constitute deliberate indifference in violation of Title IX.

218.     As a direct and proximate result of Defendants' deliberate indifference to Plaintiff Jane Doe's sexual assault and Defendants' violations of Title IX, Plaintiff Jane Doe was exposed to continued harassment that was so severe, pervasive, and objectively offensive that it effectively barred her equal access to meaningful educational opportunities and benefits including, but not limited to, academics, on-campus events and activities, and extracurricular activities.

219.     As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's sexual assault and Defendants' violations of Title IX, Plaintiff Jane Doe was subjected to a hostile education environment.

220.     As a result of the Defendants' retaliation, Plaintiff has suffered reputational harm, emotional and mental distress and are entitled to relief against Defendants, and compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II

**Violation of 42 U.S.C. § 1983 – Denial of Fourteenth Amendment Due Process**
*(Plaintiffs Jane Doe and Mother Doe)*

221.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

222.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

223.    Defendants receive federal funding and therefore are subject to the Fourteenth Amendment. The Defendants have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by the District and FDHS.

224.    At a minimum, the Supreme Court has made clear that there are two basic due process requirements: (1) notice; and (2) an opportunity to be heard. *Papin v. Univ. of Miss. Med. Ctr.,* 347 F.Supp.3d 274, 279 (S.D. Miss. Sept. 28, 2018), *citing Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005).

225.    A plaintiff must demonstrate a deprivation of a life, liberty, or property interest by the government actor. *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 440 (4th Cir. 2002).

226.    The conduct must rise to a level that it shocked "the contemporary conscience." *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 80 (4th Cir. 2016).

227.    As discussed above, the Defendants were deliberately indifferent to Plaintiff Jane Doe's assault. They conducted no investigation in accordance with the Handbook or Title IX, or implemented any protective measure. It is outrageous that this never occurred, given the Handbook, federal law, and trainings that the District publishes that directly share how to address complaints such as this.

228.    Furthermore, Defendants robbed Plaintiff Jane Doe of a meaningful opportunity to be heard on false allegation of intimidation against her by having a predetermined conclusion and not correcting any factual errors in their records.

229.    Defendants robbed Mother Doe of any opportunity to be heard on the issue of the falsified time sheet. She was not even so much as provided a copy of what she understands to be a simple, and common, clerical error.

230.    The Defendants' decisions to sanction Jane Doe to suspension and then place Mother Doe on administrative leave are arbitrary and capricious.

231.    As a direct and proximate result of Defendants' actions, Plaintiffs continue to suffer substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

232.    As a result of the foregoing, Plaintiffs have standing to seek, and are entitled to, injunctions vacating the disciplinary findings against Jane Doe and reprimand and letters pertaining to Mother Doe, and grant expungement of their records.

233.    As a result of the foregoing, Plaintiffs are entitled to prospective relief against Defendants, and compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **COUNT III**

### **TITLE IX**
*Retaliation*
*(Plaintiffs Jane Doe and Mother Doe)*

234.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

235.    As noted above, Title IX prevents discrimination on the basis of sex.

236.    Defendants the District and FDHS are the educational under that Plaintiff Jane Doe received her education from and where Plaintiff Mother Doe was employed.

237.    Defendants receive federal funding.

238.    Retaliation by an educational program receiving federal funds against a person engaging in protected activity under Title IX is actionable.

239.    Mother Doe and Jane Doe engaged in protected activity by bringing forward the complaint of sexual assault and harassment that Jane Doe suffered during the school day at Fort Dorchester, as is set forth in the above factual allegations.

240.    After the Defendants declined to take any action whatsoever,

241.    Plaintiff Jane Doe suffered repeated adverse school related actions, including but not limited to:

242.    Plaintiff Mother Doe suffered repeated adverse school related actions, including but not limited to:

243.    The protected activity is directly related to the adverse action because neither Plaintiff Jane Doe nor Mother Doe had suffered adverse action prior to the sexual assault.

244.    Retaliation for reporting a complaint is strictly prohibited by the Handbook.

245.    As a result of the Defendants' retaliatory actions, Plaintiffs' rights and responsibilities significantly altered and diminished, which negatively impacted their reputations, and Mother Doe's professional statute and earning capacity in her profession.

246.    Defendants took their retaliatory actions to prevent Plaintiffs from setting forth a complaint of sexual assault against a male student and highlighting the Defendants' own shortcomings in connection with the treatment of the sexual assault.

247.    As is noted above, the assault occurred on November 14, 2022, and concerns regarding Plaintiffs began the very next day.

248.    This retaliatory motive played a part in the adverse actions taken against Jane Doe in connection with the false allegations against her and the failure to implement protections for her.

249.    This retaliatory motive played a part in the adverse actions taken against Mother Doe in connection with the false allegations repeatedly raised against her including the wrongfully alleged time sheet issue.

250.    As a result of the Defendants' retaliation, Plaintiff has suffered reputational harm, emotional and mental distress and are entitled to relief against Defendants, and compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT IV**

**NEGLIGENCE, GROSS NEGLIGENCE, AND RECKLESSNESS AND WILLFULNESS**
*(Plaintiffs Jane Doe and Mother Doe)*

251.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

252.    To recover for negligence, a Plaintiff must show that "(1) a duty of care owed by the Defendants to the Plaintiff; (2) a breach of that duty by negligent act or omission; and (3) damage proximately resulting from the breach." *Tanner v. Florence Cnty. Treas.,* 521 S.E.2d 153, 158 (S.C. 1999).

253.    A "governmental entity may be liable for a loss resulting from a 'responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student' when the responsibility or duty 'is exercised in a grossly negligent manner.'" *Doe v. Dorchester Sch. Dist. Two*, No. 2:22-CV-03648-RMG, 2023 WL 2352159, at *4 (D.S.C. Mar. 2, 2023); *see* S.C. Code Ann. § 15-78-60(25).

254.    Gross negligence is the "intentional, conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Doe v. Dorchester Sch. Dist. Two*, No. 2:22-CV-03648-RMG, 2023 WL 2352159, at *4 (D.S.C. Mar. 2, 2023), *quoting Doe v. Greenville Cnty. Sch. Dist.*, 651 S.E.2d 305, 309 (S.C. 2007).

### A.    *Actions Pertaining to Jane Doe*

255.    The Defendants owed Plaintiff Jane Doe, a minor student it its care, custody, and control, a duty to supervise, protect, and ensure Plaintiff was safe from sexual abuse, sexual assault, discrimination, harassment and/ or intimidation especially during school hours and on school property.

256.    The Defendants failed to provide this in accordance with their own policies and procedures, including the Handbook.

257.    The Defendants breached this duty by permitting the sexual assault occur when it permitted Jane Doe to appear in an unsupervised setting—a hallway—to take her test with John Smith, resulting in her assault.

258.    The Defendants further breached this duty by demanding that Jane Doe return to the hallway after she went into the classroom to take the rest of the test in the classroom, away from John Smith.

259.    The Defendants even further breached this duty by permitted the repeated sexual harassment and discrimination on the basis of Jane Doe's gender to occur.

260.    Additionally, the Defendants also owed a duty to Plaintiff Jane Doe to provide a reasonable educational environment free from retaliation.

261. The Defendants acted in a negligent, grossly negligent, willful, wanton, and reckless manor, and breached the duty owed to Plaintiff Doe by failing to exercise even a slight degree of care in the following particulars:

    a. Failure to follow and enforce applicable District policies and procedures pertaining to sexual assault, sexual harassment, assault, and Title IX;

    b. Failure to conduct any investigation and adjudication into the sexual assault of Jane Doe, including but not limited to, conducting interviews, questioning witnesses, collecting evidence, preparing a report, and providing an outcome.

    c. Failure to adequately provide for the safety of students;

    d. Failure to adequately provide by the policies and procedures enacted by the District for the safety and security of students;

    e. Retaliation against Jane Doe after her reported sexual assault;

    f. Failure to provide sufficient training and supervision to District employees and/or their agents, more specifically on the mandatory reporting requirements; and

    g. Failure to adequately address and/or report instances of sexual assault, harassment, discrimination, and intimidation against students.

262. Defendants willfully and knowingly ignored the actions of John Smith, sending the message that they condone his conduct.

263. The Defendants acted in a negligent, grossly negligent, willful, wanton, and reckless manor, and breached the duty owed to Plaintiff Doe by failing to exercise even a slight degree of care in the following particulars, with respect to the Hearing and conduct proceeding stemming from the false allegation of threatening words to a teacher:

    a. Failure to fully investigate the allegations set forth;

b.  Failure to ascertain or discern the voices on the recording at the heart of the allegations;

c.  Failure to conduct a fair hearing in accordance with the conduct procedures proscribed;

d.  Failure to maintain accurate records related to the disciplinary proceeding;

e.  Failure to permit factual corrections to the record; and

f.  Failure to properly utilize the preponderance of the evidence standards, which would have surely resulted in Plaintiff Jane Doe being found not responsible for this erroneous allegation against her.

**B.    *Actions Pertaining to Mother Doe***

264.    The District owed a duty to Mother Doe, as an employee in the public-school setting, to provide an environment safe from discrimination, harassment and/ or intimidation, especially during school hours and on school property.

265.    The Defendants failed to provide this in accordance with their own policies and procedures, including the Handbook.

266.    The Defendants further acted in a negligent, grossly negligent, willful, wanton, and reckless manor, and breached the duty owed to Plaintiff Mother Doe by failing to exercise even a slight degree of care in the following particulars:

a.  Failure to follow and enforce applicable District policies and procedures pertaining to sexual assault, sexual harassment, assault, and Title IX with respect to her daughter, Jane Doe;

b.  Failure to conduct any investigation and adjudication into the sexual assault of Jane Doe, including but not limited to, conducting interviews, questioning witnesses, collecting evidence, preparing a report, and providing an outcome;

c.  Failure to adequately provide by the policies and procedures enacted by the District, further subjecting her to harassment;

d.  Retaliating against her after reporting the sexual assault that her daughter suffered by a male student;

e.  Failure to follow proscribed procedures regarding her reprimand and allegation concerning the time sheet;

f.  Failure to provide any documentation whatsoever regarding the allegation of the time sheet falsification that culminated in the Defendants placing her on a leave;

g.  Failure to provide any opportunity to defend herself regarding the time sheet allegation;

h.  Failure to maintain accurate records, with accurate dates and information;

i.  Failure to provide sufficient training and supervision to District employees and/or their agents; and

j.  Failure to adequately address and/or report instances of sexual assault, harassment, discrimination, and intimidation against students.

**C.  *Impact and Damages for Both Jane Doe and Mother Doe***

267.  A non-negligent educational institution conducting a Title IX disciplinary proceeding would have ensured that its personnel were thoroughly familiar with proper procedure to not only commence and investigation, but also were capable of carrying the aforementioned procedures out in a fair and impartial manner to ensure a correct outcome.

268. As a direct and proximate cause of the Defendants' negligence, gross negligence, and recklessness and willfulness, the Plaintiffs have sustained tremendous damages, including, without limitation, emotional and psychological distress (including hospitalizations), loss of educational opportunity, and other career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages that were foreseeable.

269. Accordingly, Defendants are liable to Plaintiffs for negligence, gross negligence, and recklessness and willfulness and all damages arising therefrom.

## COUNT V

### NEGLIGENT SUPERVISION
*(Plaintiff Jane Doe)*

270. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

271. "A governmental entity can be liable for negligent hiring and supervision of employees when a student has been harmed only if the entity has been grossly negligent." *Doe v. Dorchester Sch. Dist. Two*, No. 2:22-CV-03648-RMG, 2023 WL 2352159, at *5 (D.S.C. Mar. 2, 2023)

272. A plaintiff can set forth a claim for negligent supervision by stating that: (i) "the employee is on the employer's premises"; (ii) "the employee is using chattel of the employer"; (iii) "the employer knows or has reason to know he can control the employee"; and (iv) "the employer knows or should know of the necessity of controlling the employee." *Dorchester Sch. Dist. Two*, No. 2:22-CV-03648-RMG, 2023 WL 2352159, at *5 (D.S.C. Mar. 2, 2023), *citing Degenhart v. Knights of Columbus*, 420 S.E. 495, 496 (1992).

273. The Defendants are responsible for negligent supervision of the employees with respect to the actions as they pertain to Jane Doe and the events that began with her sexual assault.

274.    A non-negligent institution of education would have never placed two students alone in a hallway to take a test and then demanded that same student go back out to the hallway with her assailant.

275.    Defendants placed Plaintiff Doe in an unsafe environment, accordingly.

276.    A non-negligent institution also would have immediately commenced an investigation into the sexual assault and harassment she suffered, pursuant to Title IX and the Handbook.

277.    The Defendants acted on school premises and utilized the materials and supplies therein.

278.    The Defendants set forth policies to investigate complaints of sexual assault, harassment, and retaliation, and comply with Title IX.

279.    The Defendants knew or should have known that their employees who failed to conduct any sort of investigation in accordance with the prescribed procedures were under their supervision and control.

280.    Plaintiff is entitled to a judgment against the Defendants in an amount equal to the sum of her actual damages, including mental and emotional suffering, and for attorneys' fees and costs for bringing this action.

## COUNT VI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Plaintiffs Jane Doe and Mother Doe)*

281.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

282.    To establish a claim for intentional infliction of emotional distress, a plaintiff must: (i) "the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or

substantially certain, that such distress would result from his conduct"; (ii) the conduct rose to the level of being "severe and outrageous so as to exceed all possible bounds of decency" and are seen as "atrocious, and utterly intolerable in a civilized community"; (iii) "the actions of the defendant caused plaintiff's emotional distress"; and (iv) "the emotional distress suffered by the plaintiff was 'severe' such that 'no reasonable man could expect to endure it.'" *Morris v. Ocwen Loan Servicing, LLC*, No. 0:16-CV-01772-JMC, 2017 WL 1035944, at \*4 (D.S.C. Mar. 17, 2017).

283.    With respect to Jane Doe, the Defendants' intentionally inflicted severe emotional distress upon Jane Doe when they failed to investigate and provide supportive measures after her sexual assault.

284.    Defendants further perpetuated the intentional infliction of emotional distress upon Jane Doe by retaliating against her. Defendants purposely permitting John Smith to roam the schools freely without any supportive measures given to prevent him from interacting with Jane Doe, further exacerbating her suffering. Defendants even went so far as to place John Smith in the same room as Jane Doe for an exam when he was set to be in another room assignment due to his last name.

285.    With respect to Mother Doe, Defendants' intentionally inflicted severe emotional distress upon Jane Doe when they failed to investigate and provide supportive measures after her daughter Jane Doe's sexual assault.

286.    Mother Doe raised that they did not follow proscribed procedures with respect to the assault of her daughter. As a result, the Defendants sought to inflict severe emotional distress upon her.

287.    Defendants inflicted severe emotional distress by retaliating against Mother Doe in a manner where they repeatedly raised false allegations and put forth inaccurate and letters

containing false information to her, in a deliberate attempt to push her out of the School after she raised the allegations of sexual assault of her daughter.

288.    Defendants' intentional infliction of emotional distress upon Jane Doe and Mother Doe only intensified when they retaliated against both by bringing false allegations against them.

289.    These false allegations against Jane Doe called into jeopardy her entire academic future because Defendants placed her for evaluation for expulsion. The false allegations against Mother Doe placed into jeopardy her entire career and ability to provide for her family. Both suffered extreme reputation damages as well as a result of the false allegations made public against them.

290.    The Defendants' conduct intentionally and recklessly inflicted emotional distress for Plaintiffs, or it should have been substantially certain that such distress would result from their conduct/

291.    The emotional distress suffered by Plaintiffs was so severe that no reasonable person should be expected to endure it.

292.    Plaintiff is entitled to a judgment against Defendants in an amount equal to the sum of their actual damages, including mental and emotional suffering, and for attorneys' fees and costs for bringing this action.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons Plaintiffs demand judgment against the Defendants as follows:

(i)    On the first cause of action for Title IX- Deliberate Indifference, that Plaintiff Jane Doe be awarded a judgment of damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well

as other applicable injunctive relief any and all further actions required to return Plaintiffs to the status quo ante;

(ii)    On the second cause of action for Violation of 42 U.S.C. § 1983 – Denial of Fourteenth Amendment Due Process, that Plaintiffs Jane Doe and Mother Doe be awarded a judgment of damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as other applicable injunctive relief directing Defendants to: (a) reverse all disciplinary charges against Plaintiffs; (b) expunge all records in their entirety, including removal of all notations in of Plaintiff Jane Doe's suspension and Mother Doe's leave; and (c) any and all further actions required to return Plaintiffs to the status quo ante;

(iii)    On the third cause of action for Title IX- Retaliation, that Plaintiffs be awarded a judgment of damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as other applicable injunctive relief directing Defendants to: (a) reverse all disciplinary charges against Plaintiffs; (b) expunge all records in their entirety, including removal of all notations in of Plaintiff Jane Doe's suspension and Mother Doe's leave; and (c) any and all further actions required to return Plaintiffs to the status quo ante;

(iv)    On the fourth cause of action for Negligence, Gross Negligence, and Reckless and Willfulness, that Plaintiffs be awarded damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses,

loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(v)    On the fifth cause of action for Negligent Supervision, that Jane Doe be awarded damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(vi)    On the sixth cause of action for Intentional Infliction of Emotional Distress, that Plaintiffs be awarded damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(vii)    Punitive and/or exoplanar damages against Defendants;

(viii)    Statutory pre- and post-judgment interest on all sums awarded;

(ix)    An award of costs and attorneys' fees; and that

(x)    Plaintiffs be awarded such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Respectfully submitted,**

***Attorneys for Plaintiffs Mother Doe and Jane Doe***

**NESENOFF & MILTENBERG, LLP**

By: /s/ *Andrew T. Miltenberg*
**Andrew T. Miltenberg, Esq.**
(*pro hac vice* **forthcoming**)
**Gabrielle M. Vinci, Esq.**
(*pro hac vice* **forthcoming**)
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**gvinci@nmllplaw.com**

By: /s/ *Regina M. Federico*
**Regina M. Federico, Esq.**
(*pro hac vice* **forthcoming**)
**101 Federal Street, Nineteenth Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**
**rfederico@nmllplaw.com**

**-and-**

**FERGUSON LAW AND MEDIATION, LLC**

By: /s/ *Emmanuel J. Ferguson, Sr.*
**Emmanuel J. Ferguson, Sr., Esq.**
**Federal Bar No. 11941**
**171 Church Street, Suite 160**
**Charleston, South Carolina 29401**
**(843) 491-4890**
**emmanuel@fergusonlaborlaw.com**

**Charleston, South Carolina**
**November 14, 2024**